6 So.3d 643 (2009)
In the Interest of G.C., K.C., and J.P.-B., children.
J.C. and G.P.-B., Appellants,
v.
Department of Children and Family Services and Guardian Ad Litem Program, Appellees.
Nos. 2D08-1409, 2D08-1416.
District Court of Appeal of Florida, Second District.
February 25, 2009.
Rehearing Denied April 21, 2009.
*644 David A. Dee, Tampa, for Appellant J.C.
Ingrid Anderson, Clearwater, for Appellant G.P.-B.
Bill McCollum, Attorney General, Tallahassee, and Kelley R. Schaeffer, Assistant Attorney General, Tampa, for Appellee Department of Children and Family Services.
Thomas Wade Young, Appellate Counsel, Orlando, for Appellee Guardian ad Litem Program.
WALLACE, Judge.
J.C. (the Father) and G.P.-B. (the Mother) appeal a final judgment that terminated their parental rights to their children. Because the Department of Children and Families (DCF) did not prove a ground for termination by clear and convincing evidence, we reverse the final judgment of termination and remand for further proceedings.

I. THE FACTS

A. Background
DCF sought to terminate the Father's parental rights to K.C., born April 24, 2003, and G.C., born April 21, 2004. DCF also sought to terminate the Mother's parental rights to K.C. and G.C. and to the Mother's other child, J.P.-B., born January 16, 2001. The Father and the Mother are the unmarried parents of K.C. and G.C. The Father, J.C., is not J.P.-B.'s father; that child has a different father.
On August 3, 2005, DCF filed an emergency shelter petition for the three children that alleged that the children had *645 been abused, neglected, or abandoned. In particular, the petition alleged that while the Mother slept, J.P.-B. slipped out of the house early in the morning and walked down the street unsupervised. J.P.-B. did not sustain any injuries during this incident. Afterward, the parents separated and the Mother moved in with her mother (the maternal grandmother). After the Mother was arrested for burglary and criminal mischief, the maternal grandmother called DCF because she could not care for the children. The circuit court ordered that the three children be placed in shelter care.
Subsequently, DCF filed a petition for dependency alleging that (1) the Mother allowed the children to be deprived of necessary food, clothing, shelter, or medical treatment; (2) the Mother allowed J.P.-B. to walk around the neighborhood unsupervised; (3) the Father abandoned K.C. and G.C.; and (4) the Father could not parent K.C. and G.C. because he lacked appropriate housing. On February 27, 2006, the three children were adjudicated dependent as to the Mother because (1) she was unable to obtain suitable housing for herself and the children and (2) she let J.P.-B. walk around the neighborhood unsupervised. On the same date, K.C. and G.C. were adjudicated dependent as to the Father because he had "no appropriate housing for the children." The parents consented to the adjudications of dependency.
The initial and updated case plans had a goal of reunification. Both case plans required the parents to (1) maintain adequate housing for a period of no less than six months; (2) demonstrate stability in their ability to provide necessary food, shelter, and clothing; (3) participate in visitation; (4) successfully complete an approved parenting program; (5) maintain a clean home; (6) provide optimal health care to the children; (7) provide optimal educational benefits to the children; (8) discipline the children without threat of harm; (9) provide safe and adequate supervision over the children at all times; (10) complete an approved domestic violence evaluation and improve child/family safety; (11) reimburse the State for the cost of care provided to the children; (12) commit no further law violations; and (13) ensure the children's safety. The case plans also required the Mother to (1) establish J.P.-B.'s paternity and (2) complete an anger management program and control aggressive outbursts. The initial plan required both parents to complete a mental health assessment, but the updated plan only required a mental health assessment for the Mother.
Thereafter, the Mother did not complete her mental health tasks. She told the guardian ad litem that the Father had hit her in April 2006, but the guardian ad litem did not observe any injuries on the Mother. In April and June 2007, the police responded to two incidents where the Mother gave sworn written statements alleging that the Father had battered her. On both occasions, the police took photographs showing bruises to the Mother's face and torso. The Father was initially arrested after each incident but was subsequently released when the charges were dismissed. The Mother obtained an injunction against the Father in 2007.
On September 19, 2007, DCF filed a petition for termination of parental rights as to both parents. This petition alleged that the Mother had been offered services through a case plan but that she had failed to complete the case plan tasks related to parenting, anger management, domestic violence, and stable employment. For this reason, DCF requested that the Mother's parental rights be terminated under subsections 39.806(1)(c) and (e), Florida Statutes (2007). The petition also requested *646 termination of the Father's parental rights as authorized by the same statutory subsections[1] because the Father failed to complete a domestic violence evaluation after an incident of domestic violence.

B. The Termination Hearing
The termination hearing took place over three separate days. On the first day, the Mother testified that J.P.-B. and K.C. were removed from her care in 2003 after she "smacked [J.P.-B.] on the face" but were returned within five months. The Mother explained that in 2005 the children were not adjudicated dependent because of domestic violence but because she could not provide them with necessary food, clothing, and shelter after she was jailed. The Mother stated that she was currently living with the Father, who had inherited a house and was earning enough to pay the mortgage.
The Mother denied all domestic violence except for an incident in June 2005 that did not occur in the children's presence. The Mother admitted that she obtained an injunction against the Father in 2007 but testified that her written statements to the police in April and June 2007 were false. The Mother claimed that she made the false statements based on a relative's advice to obtain a restraining order against the Father and otherwise get him into trouble so that DCF would return the children to her. The Mother did not tell her counselors that she was in a relationship involving domestic violence.
The Mother admitted that she had been diagnosed as bipolar. She had been prescribed medications as a teenager but did not have a current prescription. The Mother conceded that she had not completed her mental health tasks because she did not like her new therapist.
The Father testified that he had completed all case plan tasks, including a mental health evaluation. The Father owned a house and was able to pay the mortgage and support the family. The Father admitted that he had a domestic violence conviction based on the June 2005 incident, but he denied that any domestic violence took place in April or June 2007. He explained that the Mother had fabricated those allegations and that the charges related to those incidents had been dismissed.
On June 3, 2007, Deputy William Baker responded to the Mother's initial complaint. He testified that the Mother had a black eye on the day of the incident but that this injury was almost healed. He was concerned about the veracity of the Mother's written statement because the injury was old and the Father's hands showed no injuries consistent with the Mother's allegations. Deputy Baker explained that no action was taken because there was no evidence to substantiate the Mother's claims.
Mr. Patrick Mital, the guardian ad litem originally assigned to the children, testified that the Mother told him that the Father had hit her in April 2006. However, he did not see any injuries to the Mother on that date and he never witnessed any domestic violence. He also indicated that the Mother said that she was pursuing an injunction against the Father because of his aggressive behavior. Mr. Mital opined that the children should not be returned to the parents' unstable home because the Mother's statements showed that the parents had not significantly improved.
*647 Mr. Michael A. Cribbs, the guardian ad litem who succeeded Mr. Mital, observed that the parents and the children loved each other and that visitations went well. Mr. Cribbs also indicated that the Mother had never been required to undergo a psychiatric evaluation. Nevertheless, he expressed his concerns about the domestic violence incidents and recommended termination of parental rights under section 39.806(1)(c).
The case manager, Roxane Hafer, testified that the Mother had complied with all case plan tasks  including the stable housing and financial stability requirements  except for the mental health tasks. She also indicated that the Father had completed all case plan tasks but had further law violations. Ms. Hafer recommended termination because of ongoing domestic violence issues. She did not witness any domestic violence and relied on the Mother's written statements regarding the April and June 2007 incidents and the Mother's statements to Mr. Mital. Ms. Hafer also detailed her concerns about the Mother's mental health. She testified that the Mother self-reported a history of mental health issues. Ms. Hafer referred the Mother for individual therapy. Although she never saw any documents indicating that the Mother had been prescribed psychiatric medications, Ms. Hafer offered the Mother a referral for psychiatric medications, but the Mother would not accept it.
Dr. Filomena Ferrara conducted a psychological evaluation of the Father. Dr. Ferrara testified that she read the police reports regarding the April and June 2007 incidents and that the parents had explained that the allegations were false and the charges had been dismissed. Dr. Ferrara said that the parents minimized the existence of violence. She noted that the Father did not suffer from any mental illness and did not need psychological treatment. Dr. Ferrara indicated that her records did not show that the children had been placed in danger. She saw no harm in reunifying the children with the Father if some in-home services were provided. However, she did not recommend reunification if both parents were together unless there was additional intervention.
Dr. Michael K. Johnson testified about his psychological evaluation of the Mother. Dr. Johnson expressed concerns about the Mother's self-reported history of mental health issues. Dr. Johnson testified that he could not determine if the Mother needed medication because no psychiatric care or evaluation had been recommended for her. Dr. Johnson pointed out that the Mother's character deficiencies and mental health issues could be addressed by psychiatric counseling and treatment, but he later indicated that the Mother was not receptive to treatment. According to Dr. Johnson, she told him that she did not want to participate in mental health services. We note that Dr. Johnson recommended psychiatric care for the Mother during the termination hearing, but he did not discuss this recommendation with the Mother before the hearing. Thus the Mother never had an opportunity to reject Dr. Johnson's recommendation. Dr. Johnson ultimately recommended termination unless the mother would "genuinely and openly enter into" psychiatric treatment.
Dr. Johnson reviewed the police reports regarding the April 2007 incident. He stated that the Mother told him she had lied about this incident. He explained that the children would have been negatively impacted if they were present when the domestic violence incidents occurred. He also testified that the domestic violence would have a detrimental effect on the Mother's parenting ability if it occurred after services had been provided. Dr. *648 Johnson also opined that his concerns would not be allayed if the Mother's allegations of domestic violence had been false, because her lies could negatively affect the children.
On the third day of the hearing, the Mother testified that she had moved out of the Father's residence because of Dr. Ferrara's opinion recommending reunifying the children with the Father. The Mother indicated that she planned to live with the Father and the children but that she was willing to delay her return. She also stated that she was willing to follow Dr. Johnson's recommendations, including any therapy and counseling.

C. The Court's Order
The circuit court ruled that termination was not appropriate under section 39.806(1)(c) because DCF had not proven by clear and convincing evidence that the parents' continuing involvement in the children's lives posed a risk to the children despite the provision of services. In particular, the court noted that it could not determine whether any provision of services would be futile.
However, the circuit court terminated the parental rights of the Mother and Father for substantial noncompliance as authorized by section 39.806(1)(e) because it found by clear and convincing evidence "that neither parent ha[d] completed his or her case plan." The court explained that to determine whether the parents were in "substantial compliance," as defined in section 39.01(71), it had to determine whether the problems which caused the case to be filed had been ameliorated. The circuit court found that the children were removed from the parents' care because the parents could not provide supervision and care since the Father lacked appropriate housing and the Mother had been arrested and evicted. Although the circuit court determined that the parents had stable housing and could financially support the children, it concluded that the parents had not substantially complied with their case plans because (1) they had not eliminated household violence, (2) the Mother had not completed her mental health tasks, and (3) the Mother had not completed her anger management tasks. The court also indicated that the Mother's mental health issues contributed to the volatility of the parents' relationship. According to the circuit court, "[t]hese parents have yet to engage in meaningful services in that they have denied their [domestic violence], denied their angry natures[,] and otherwise thwarted all efforts to assist them."
Each of the parents appealed the order terminating their parental rights. On our own motion, we consolidated the parents' cases.

II. THE LEGAL BACKGROUND
To grant a petition for termination of parental rights, the circuit court must find that DCF proved the allegations supporting termination by clear and convincing evidence. E.E.A. v. Dep't of Children & Family Servs., 846 So.2d 1250, 1251-52 (Fla. 2d DCA 2003). The circuit court must first find grounds for termination of parental rights under section 39.806 and then must consider the manifest best interests of the child under section 39.810. Rathburn v. Dep't of Children & Families, 826 So.2d 521, 523 (Fla. 4th DCA 2002). In addition, DCF must establish that termination of parental rights is the least restrictive means of protecting the child from harm. E.E.A., 846 So.2d at 1251-52. On appeal, the circuit court's ruling should be affirmed if, upon the evidence presented to the circuit court, there is any principle or theory of law that would support the circuit court's judgment terminating *649 parental rights. G.W.B. v. J.S.W., 658 So.2d 961, 967 (Fla.1995).

III. DISCUSSION

A. Substantial Noncompliance
The Parents argue that the circuit court erred when it found that they did not substantially comply with their case plan because the reasons for the case plan had been remedied. In response, DCF contends that (1) the Mother was in substantial noncompliance because "[s]he failed to properly address her mental health issues and maintained a relationship that was plagued by a history of domestic violence" and (2) the Father was in substantial noncompliance because "he had not forthrightly participated in the services required by the children's case plan."
The circuit court found that DCF had proven by clear and convincing evidence that both parents' rights should be terminated as authorized by section 39.806(1)(e) because "neither parent has completed his or her case plan." Section 39.806(1)(e)(1) provides that parental rights can be terminated when "[t]he child continues to be abused, neglected, or abandoned by the parents." The statute presumes that the parent's failure to "substantially comply" with the case plan for a period of twelve months after the child is adjudicated dependent constitutes evidence of "continuing abuse, neglect, or abandonment" unless the failure to "substantially comply" was due to the parent's lack of financial resources or DCF's failure to make reasonable efforts toward reunification. Id. "`Substantial compliance' means that the circumstances which caused the creation of the case plan have been significantly remedied to the extent that the well-being and safety of the child will not be endangered upon the child's remaining with or being returned to the child's parent." 39.01(71) (emphasis added); E.R. v. Dep't of Children Family Servs., 937 So.2d 1196, 1198 (Fla. 3d DCA 2006).
The circumstances which caused the creation of the case plan for the Mother were lack of housing and inadequate supervision of J.P.-B. With respect to the Mother, the dependency order recited that the factual basis for the adjudication of dependency was that the Mother (1) neglected the children because she "was arrested as [DCF] was attempting to assist [her] in obtaining suitable housing for herself and the children" and (2) provided inadequate supervision of J.P.-B. The Mother's case plan states that "[t]he children were sheltered as neither parent has stable housing." The petition for termination of parental rights indicates that the children were originally sheltered "due to the [M]other's inability to provide them with necessary food, clothing[,] and shelter." The circuit court's written order found that "[t]he three children were ultimately removed in August[ ] 2005 when the Mother was arrested for burglary and criminal mischief and evicted from her home" and "this case originated due to an incarcerated/evicted/abusive mother."
Similarly, the circumstance which caused the creation of the case plan as to the Father was a lack of housing. With respect to the Father, the dependency order recited that the factual basis for the adjudication of dependency was that the Father was "not capable to parent the children, as he currently has no appropriate housing for the children." The Father's case plan states that "[t]he children were sheltered as neither parent has stable housing." The circuit court's written order found that "[t]he factual basis for the dependency as to the Father was that `he currently has no appropriate housing for the children ... the children have no *650 parent capable of providing supervision and care.'" (Omission in original.)
Nevertheless, DCF claims that "[t]he children were sheltered because [of] the Mother's mental health issues and her failure to recognize the impact the domestic violence had on the family." Along these lines, the circuit court found that "the problems which brought this case into care have [not] been ameliorated" because "domestic violence continues in this relationship and ... the parents have not benefitted from remediation." This was error because "the `substantially comply' language contained in section [39.806] ... is a term of art [that] requires more than just a determination that the case plan has not been completed." B.L. v. Dep't of Children & Families, 950 So.2d 1264, 1266 (Fla. 5th DCA 2007).
Instead, the proper inquiry should have been whether the lack of housing and inadequate supervision of J.P.-B. "ha[d] not been significantly remedied to the extent that the well being and safety of [J.P.-B., G.C., and K.C.] will be endangered upon the child[ren] ... being returned to the parents." Id. The circuit court found that the parents had stable housing, the Mother was applying for disability benefits due to her asthma, and the Father worked regularly, earning between $2000 to $6000 monthly. The parents finished a parenting class and visited as often as possible with the children. Above all, there was no indication that domestic violence caused any harm to the children because the children were not present when the alleged incidents occurred. See § 39.01(31)(i) (defining "harm" to a child as "violent behavior that demonstrates a wanton disregard for the presence of a child and could reasonably result in serious injury to the child"). Thus the circuit court erred in finding that DCF proved by clear and convincing evidence that the parents' rights should be terminated under section 39.806(1)(e).
The Guardian ad Litem Program argues for affirmance based on A.W. ex rel. B.W. v. Department of Children Families, 969 So.2d 496 (Fla. 1st DCA 2007). In that case, DCF sought to terminate A.W.'s parental rights under subsections 39.806(1)(b), (c), or (e), Florida Statutes (2006). Id. at 498. The First District explained that A.W.'s technical compliance did not indicate that she had substantially complied with her case plan because she had not significantly remedied one of the reasons why her child was adjudicated dependent, i.e., A.W.'s inability to learn basic parenting skills. Id. at 497-98. Unlike in A.W., here, the parents remedied the lack of housing, which was the original reason why the children were first sheltered and then adjudicated dependent. Moreover, this case is also distinguishable because the First District affirmed the termination of the mother's parental rights in A.W. based on section 39.806(1)(c). See id. at 503-04. For the reasons explained below, we cannot affirm the trial court's ruling based on section 39.806(1)(c).
Because DCF did not establish that the lack of housing and inadequate supervision issues had not been significantly remedied to the extent that the well-being and safety of the children would be endangered upon their return to the parents, the circuit court erred when it terminated the parental rights of the Mother and the Father under section 39.806(1)(e).

B. Continuing Involvement
Because we must affirm the termination of parental rights if any principle or theory of law supports the circuit court's decision, G.W.B., 658 So.2d at 967, we consider whether DCF presented clear and convincing evidence for termination under section 39.806(1)(c).
*651 Section 39.806(1)(c) authorizes the termination of parental rights "[w]hen the ... parents engaged in conduct toward the child or toward other children that demonstrates that the continuing involvement of the ... parents in the parent-child relationship threatens the life, safety, well-being, or ... health of the child[ren] irrespective of the provision of services." "In essence, the ... court must find that any provision of services would be futile or that the child would be threatened with harm despite any services provided to the parent." R.W.W. v. State, Dep't of Children & Families, 788 So.2d 1020, 1023 (Fla. 2d DCA 2001). Termination under section 39.806(1)(c) requires two specific findings: "first, that continued interaction with the parent threatens the life, safety, or health of the child, and second, that this threat cannot be remedied by the provision of services." T.H. v. Dep't of Children Family Servs., 979 So.2d 1075, 1082 (Fla. 2d DCA 2008).
We cannot affirm under section 39.806(1)(c) for two reasons. First, we are not convinced that continued interaction with the parents threatens the children. DCF's only allegation of harm was that the parents have forced the children to live without them in foster care. The children's placement in foster care, by itself, did not threaten their life, safety, or health. Granted, the circuit court's order indicates that the children have suffered abuse while in foster care and the parents "fail to take any responsibility for their children being placed in harm's way." Nevertheless, any abuse inflicted while in foster care is the direct result of DCF's placement of the children with the particular foster care providers and cannot be the basis for termination under section 39.806(1)(c). See E.E.A., 846 So.2d at 1252.
DCF did not establish that the alleged domestic violence and the Mother's self-reported mental health issues harmed the children or threatened their lives, safety, or health. Although there was no showing of past harm, Dr. Ferrara and Dr. Johnson opined that the children could be detrimentally impacted if returned to the parents. Because termination under section 39.806(1)(c) in this case would be based on prospective harm, we must determine if there is a substantial risk of significant harm to the children. See J.F. v. Dep't of Children Families, 890 So.2d 434, 440 (Fla. 4th DCA 2004); L.B. v. Dep't of Children Families, 835 So.2d 1189, 1194-95 (Fla. 1st DCA 2002). In other words, we must decide whether DCF demonstrated a nexus or predictive relationship between the past domestic violence or the Mother's mental health issues and future harm to the children. See L.D. v. Dep't of Children Family Servs., 957 So.2d 1203, 1205-06 (Fla. 3d DCA 2007) (explaining that there must be a nexus between the parent's past conduct and future harm to the child before the court can terminate the parent's rights under section 39.806(1)(c) based on prospective harm); S.S. v. D.L., 944 So.2d 553, 559 (Fla. 4th DCA 2007) ("[T]here must be a further nexus between the past conduct and future behavior.").
Here, the children were not adjudicated dependent based on the alleged domestic violence or on the Mother's self-reported mental health issues. DCF conceded in its opening statement that the children were not present during the alleged incidents of domestic violence. Consequently, DCF did not establish that the alleged domestic violence harmed the children because the children were not present when the alleged domestic violence occurred and there was no evidence that they were otherwise aware of it. See J.C. v. Dep't of Children Family Servs., 947 So.2d 1246, 1248-49 *652 (Fla. 2d DCA 2007). Evidence that the Father committed domestic abuse on an adult, the Mother, outside the children's presence, is not predictive of future harm to the children. See id. at 1250. Furthermore, the Father does not suffer from any physical or mental illness or condition that would inhibit his proper care of K.C. and G.C. in the future. Although the Mother admitted a history of mental health issues, Dr. Johnson did not testify that these issues would inhibit the Mother's proper care of the children. Under these circumstances, we cannot conclude that continued interaction with the parents threatens the life, safety, or health of the children.
Second, DCF did not prove that any provision of services would be futile. Dr. Ferrara testified that the children could be reunified with the Father if he was provided in-home services. Dr. Johnson indicated that the Mother would likewise benefit from in-home services, but he gave conflicting testimony regarding any future psychiatric treatment. Although he indicated that the Mother's mental health issues could be addressed through counseling and treatment, he also stated that the Mother was not receptive to treatment. Based on these experts' assessments, we are not convinced that DCF proved by clear and convincing evidence that any potential threat presented by the alleged domestic violence or the Mother's self-reported mental health issues cannot be remedied by the provision of services. Thus we agree with the circuit court's decision not to terminate parental rights under section 39.806(1)(c).

IV. CONCLUSION
For the foregoing reasons, we reverse the final judgment that terminated the Father's parental rights to K.C. and G.C. and the Mother's parental rights to J.P.-B., K.C., and G.C.
On remand, the circuit court should dispose of these cases as authorized by section 39.811(1) and Florida Rule of Juvenile Procedure 8.525(i). If the court finds grounds to re-adjudicate the children dependent under the more relaxed preponderance-of-the-evidence standard applicable in dependency hearings, see 39.507(1)(b), the court may continue the children's placement in foster care under an amended case plan, see 39.6013(4),.811(1)(a).
Reversed and remanded for further proceedings.
SILBERMAN and KELLY, JJ., Concur.
NOTES
[1] DCF also requested termination of the Father's parental rights under subsections (b), (f), and (g). However, DCF orally struck those grounds from the petition during the termination hearing.